**IN THE UNITED STATES DISTRICT COURT**
**FOR THE WESTERN DISTRICT OF NORTH CAROLINA**
**CHARLOTTE DIVISION**
**3:16-CV-00834**

| | |
|---|---|
| JOHN BARBERO,<br><br>                Plaintiff,<br><br>  v.<br><br>ZURICH AMERICAN INSURANCE<br>COMPANY, JANET HEDRICK, and<br>DUSTY WILSON<br><br>              Defendants. | **VERIFIED AMENDED**<br>**COMPLAINT** |

COMES NOW Plaintiff John Barbero ("Plaintiff" or "Barbero"), complaining of the Defendants Zurich American Insurance Company ("Defendant Zurich" or "Zurich"), Janet Hedrick ("Defendant Hedrick" or "Hedrick"), and Dusty Wilson. ("Defendant Wilson" or "Wilson") (collectively, "Defendants"), and alleging as follows:

## NATURE OF ACTION

1.      Barbero, a former employee of Zurich, brings this action against Defendants and alleges causes of action based on his complaints of disability discrimination, harassment, and retaliation for exercising his right to accommodation under the Americans with Disabilities Act of 1990, as amended, 42 U.S.C. § 12101, *et seq.* ("ADA") and based on his gender in violation of Title VII of the Civil Rights Act of 1964, 42 U.S.C. sections 2000e, *et seq.* ("Title VII"). Additionally, Barbero asserts claims of battery against Zurich; negligent retention and supervision against Zurich; and negligent infliction of emotional distress against Zurich, Hedrick and Wilson.

Case 3:16-cv-00834-RJC-DSC   Document 2   Filed 12/08/16   Page 1 of 34

## JURISDICTION AND PARTIES

2.     The unlawful employment practices alleged in this complaint were committed in North Carolina or had impact on Barbero while he lived in North Carolina and worked for Zurich in North Carolina.

3.     Barbero, a former employee of Zurich, is a citizen and resident of Mint Hill, Mecklenburg County, North Carolina.

4.     Upon information and belief, Zurich is a New York corporation, with its principal office in Schaumburg, Illinois, that does business and has offices in North Carolina.  At all relevant times, Zurich has been an employer within the meaning of the ADA and Title VII, having over 500 employees.

5.     Upon information and belief, Hedrick was at all relevant times an employee of Zurich and is a citizen and resident of Evanston, Illinois.

6.     Upon information and belief, Wilson was at all relevant times an employee of Zurich and is a citizen and resident of Advance, North Carolina.

## ADMINISTRATIVE PROCEDURES

7.     Barbero timely filed a complaint of violation of Title VII against Zurich with the Equal Employment Opportunity Commission ("EEOC") on March 5, 2015 by submitting an EEOC intake questionnaire by facsimile to Reuben Daniels, Jr., Director, of the EEOC Charlotte District Office.

8.     Barbero later signed on or about April 10, 2015 the Charge of Discrimination prepared by the EEOC.

2

9.      On or about August 5, 2016, the EEOC issued a "notice of right to sue" entitling Barbero to commence this action within 90 days of his receipt of that notice, which Barbero received on or about August 10, 2016.

10.     Barbero filed an Application and Order Extending Time to File Complaint on November 8, 2016.

11.     Barbero filed his original Complaint on November 28, 2016, and now files this Verified Amended Complaint.

12.     Barbero has satisfied all private, administrative and judicial prerequisites to the institution of this action.

## BACKGROUND

13.     Barbero was employed by Zurich from October 15, 2012 to September 19, 2014. At all relevant times, Barbero was and still is able to perform the essential functions of his position in Zurich's employ, with reasonable accommodation, and therefore has been a "qualified individual with a disability" within the meaning of 42 U.S.C. § 12111(8) and/or has been "regarded as" such within the meaning of 42 U.S.C. § 12102(2)(C) and/or has a "record of a disability" within the meaning of 42 U.S.C. § 12102(2)(B).

14.     Throughout his tenure with Zurich, Barbero fully met expectations and was praised for his outstanding relationships with car dealers because of his previous automotive retail experience.

15.     Barbero suffers from a gastro-intestinal issue called Mallory-Weiss syndrome ("MWS"), with gastric reflux. Upon information and belief, MWS is known to cause vertical tears in the junction between the esophagus and the stomach, which can cause upper gastrointestinal bleeding. Upon information and belief, Symptoms of MWS can include

persistent and often violent retching and vomiting which can happen after any event which provokes a sudden rise in intragastric pressure or gastric prolapse into the esophagus, including significant stress.

16.     In Barbero's case, his MWS was so severe that his esophagus eventually tore completely away from his stomach, as described below.  Indeed, he suffered acute blood-loss anemia, acute encephalopathy, hemorrhagic shock, and acute respiratory failure.  Thereafter, he had trouble sleeping and developed anxiety and psychological changes after his near-death experience and as a result of discrimination, harassment and the hostile work environment he endured at Zurich.

17.     Barbero must keep anti-nausea medicine on hand because of the risk of a repeated tear if he vomits, and he must take a heavy dose acid-blocker to suppress stomach acid, which may help prevent further trauma to the esophagus.  In addition, after the event described below, in particular, he needed to reduce and manage his stress levels, which can aggravate his condition.

18.     Barbero attended a company sales seminar on November 11-12, 2013.  While there, Barbero became quite nauseated and ill and began vomiting frequently.  Defendant Wilson, Regional Finance and Insurance Manager and Barbero's direct supervisor, was angry that Barbero was ill, yelled and cursed at Barbero, and objected to him leaving the seminar room to go to the restroom.  When Barbero asked to go to his hotel room to lie down, Wilson responded "Absolutely not.  This is your punishment" and accused Barbero of drinking too much the previous night.

4

19.     Upon information and belief, Zurich knew of Wilson's history of yelling, cursing, and retaliating against his employees, but did not take appropriate or adequate action to correct this behavior.

20.     Barbero needed to go back to his hotel room and lie down to try to get his symptoms under control.  However, when he asked Wilson if he could do so, Wilson denied the accommodation and insisted that Barbero attend the meetings.

21.     Because of Barbero's symptoms of nausea and repeated, violent vomiting, Wilson accused Barbero of being hung over, which Wilson knew or should have known was clearly not the case because Wilson and Barbero had dined together with the other Zurich employees the previous night, and Barbero had not consumed excessive amounts of alcohol or exhibited signs of drunkenness.

22.     Wilson continued to harass and belittle Barbero about his vomiting throughout the day.  Barbero was scared to leave the seminar because he thought his job would be on the line if he did so.

23.     Eventually, Barbero became so dizzy from vomiting that he returned to his room to avoid losing consciousness at the seminar.  Because Barbero was not allowed to immediately and properly deal with his nearing-critical health issues, his health progressively declined to the point where he began vomiting blood, had rectal bleeding, which were extreme, and had to be rushed to the emergency room.  He lost consciousness in the ambulance.

24.     Upon information and belief, Barbero's life hung in the balance because of the delay in appropriate treatment.  He required a blood transfusion as a result of massive upper gastrointestinal bleeding, the use of a respirator, and surgical reattachment of his esophagus.

25. Upon information and belief, at one point during the day, Barbero went into cardiopulmonary arrest and needed to be resuscitated. His condition was so grave that he was admitted to the critical care unit and spent over a week in a hospital out of town to control and recover from the life-threatening hemorrhage. Barbero's family was told many times the first night and thereafter that he would very likely not survive.

26. Wilson came to the hospital to visit Barbero. While there, he asked prying questions about what happened to Barbero and the seriousness of Barbero's condition. He did not express concern about Barbero's health or console or provide reassuring words to Jennifer Barbero, Barbero's wife. Instead, he focused on himself, saying things like:

        (a)     I can't believe this is happening to me;

        (b)     What am I going to do; and,

        (c)     How am I going to explain this to senior management?;

27. Jennifer Barbero repeatedly told him that she needed to tend to her young daughter who was running around in the waiting room, and that she needed to make and return calls and messages from friends and family members. Wilson could hear how often her phone was buzzing and ringing. When the doctor came to give Jennifer Barbero an update, Wilson did not show her the courtesy of leaving the room to afford her some privacy; he stayed and listened to the doctor's remarks.

28. Upon information and belief, later during Barbero's hospital stay, Wilson returned to the hospital with his wife, who said she was an emergency room nurse. Upon information and belief, instead of offering support and condolences, Wilson's wife challenged the nature and extent of Barbero's health problems, saying she had never heard of what happened to Barbero happening to someone else.

29.     Upon information and belief, Wilson's wife boldly picked up and reviewed Barbero's medical records without his consent or the consent of his wife, and said "this is all wrong" in front of a family member who indicated that she should not be reading Barbero's medical chart.

30.     Upon information and belief, Wilson had to report Barbero's health crisis and prognosis to management. Management did not follow up with Barbero or his wife to ask what he needed then, or when he returned to work, by way of accommodations.

31.     During his hospital stay, Barbero and his family were told that the prognosis was not good and that, if he survived, he would have a speech impediment and other serious complications.

32.     Barbero managed an impressive recovery and returned home after being in the hospital for eight days. He continued to suffer from anemia and gastrological issues after his discharge from the hospital and has had to follow a strict healthcare management routine and take medications since that time.

33.     Barbero was pressured to return to work by Wilson and his then-business partner, Jamie Holder ("Holder"), who accused Barbero of exaggerating or making up his health problems.

34.     Barbero complained to Wilson about Holder's harassment and inappropriate remarks, but Wilson continued to pressure Barbero to return to work early as well and Wilson told Barbero that Holder could not keep up without Barbero.

35.     Barbero told Wilson that he wanted to return to work and help the team, but explained that his health was a ticking "time bomb," that he needed to keep his stress levels

under control, and that Holder's harassment was causing an unreasonable and severe level of stress, which would spark a recurrence of his physical symptoms.

36.     Upon information and belief, Zurich did nothing to prevent Holder from harassing Barbero. In addition, Barbero felt pressure to return to work early to avoid retaliation from Wilson.

37.     Barbero suffered a setback to his health soon after his return to work.  On or about December 3, 2013, Barbero was again rushed to the ER during a customer meeting. The customer expressed concern about Barbero, his health, and his skin coloring, which was turning an alarming and unnatural shade of gray.  The customer encouraged Barbero to seek medical attention and Barbero did so.

38.     Barbero was forced to take time off to deal with his disability and the ongoing complications arising from his esophagus being torn away from his stomach due to the delay in treatment caused by Wilson's refusal to accommodate him.

39.     During Barbero's absence, Holder accused Barbero of taking more leave than he needed rather than offering his support to Holder in Holder's time of need.   Holder also made a number of inappropriate comments about Barbero's health and disability.

40.     Barbero returned to work on January 6, 2014.

41.     Soon thereafter, in March 2014, Holder continued to verbally abuse Barbero and made a highly inappropriate comment about Barbero's wife, saying that she was way prettier than he remembered, but that he wouldn't "f***" her or anything.

42.     Barbero complained about this harassment to management, but upon information and belief, nothing was done to rectify the situation.  Instead, management promoted Holder to a management position.

43.     After Holder's promotion in May 2014, Barbero was forced to cover the entire territory by himself and Wilson, another manager, and the senior manager of the southeast region, complimented Barbero on covering the territory well and without a partner.

44.     Management told Barbero that they were going to transfer female employee Connie Clarke ("Clarke") from New York to take Holder's former position, although there was a better candidate available.

45.     Barbero's position required him to work closely with his partner and it was important to Barbero's personal success, and the success of his region, for him to have a partner who was competent, well qualified, and with whom he was compatible.

46.     In choosing Clarke, Zurich knew or should have known that, rather than accommodating Barbero's reasonable request for a less stressful environment free of harassment, it was subjecting Barbero to a hostile work environment, sexual harassment, and extreme levels of stress that caused risk of harm to his health.  Management asked Barbero to meet with Clarke in person to discuss his region and the position of his business partner.  Barbero cooperated with management's instruction.

47.     When Barbero met with Clarke, he tried to focus the discussion on work-related matters.  However, despite Barbero repeatedly asking her to stop, Clarke kept steering the conversation to inappropriate topics, including:

    (a)     personal information he did not want to hear;

    (b)     allegations of abuse by her ex-husband;

    (c)     allegations of abuse and harassment by male coworkers;

    (d)     allegations of sexual harassment, assault, and battery by a male coworker; and

9

(e) allegations that male coworkers were threatened by her because she was a superior performer to them.

44.  Clarke also alleged to Barbero that Zurich management was allowing her to move into whatever open position she wanted in order to avoid a lawsuit for sexual harassment, assault and battery allegedly committed by her former business partner during a work-related conference.

45.  Upon information and belief, Clarke had a pattern and practice of making inappropriate comments to coworkers and making up untrue statements about them.

46.  Upon information and belief, the person Clarke accused was put on administrative leave during the investigation into her allegations and pendency of any criminal charges.

47.  Barbero took his concerns to management, explaining that Clarke made him extremely uncomfortable due to her inappropriate personal comments and accusations of sexual harassment and assault by coworkers, and stated that he would prefer not to work with her as a result.

48.  Zurich was aware of Barbero's health and disability history, and knew that he needed to decrease rather than increase his stress level or else risk another health crisis.

49.  Upon information and belief, Zurich failed and refused to put Clarke on administrative leave after Barbero reported sexual harassment against her and, upon information and belief, after she failed to follow Zurich's instructions not to discuss her allegations of sexual assault by a coworker, and later, after new allegations were made about her drunk dancing at a company event and making inappropriate comments to coworkers at company events, and despite her prior false allegations against coworkers.

50.  Upon information and belief, Clarke also complained that Wilson made her uncomfortable.

51.     Upon information and belief, at the time Barbero complained regarding Clarke, Zurich had already decided that her allegations of sexual assault by a coworker were false.

52.     Despite Zurich's knowledge of Barbero's concerns and risks in working with Clarke, both management and Zurich's general counsel, Defendant Hedrick, informed Barbero that he had no choice but to work with and be partnered with Clarke.

53.     Hedrick further instructed Barbero <u>not to discuss Clarke, or issues involving her, with the two state managers, Barbero's coworkers, or even his own wife</u>.  Hedrick further instructed Barbero to work with Clarke so Zurich could avoid a multimillion dollar lawsuit from her.

54.     Even though Barbero continued to oppose Clarke's unlawful behavior, Hedrick dismissed his concerns, told him that he needed to help them out by working with Clarke, and that Zurich management would "have [his] back."

55.     Barbero's concerns were well founded: Clarke continued to sexually harass Barbero, which caused him to be worried and anxious because of his fragile health and need to control and reduce his stress levels. Her inappropriate and unacceptable behavior included:

(a)     On the first day they worked together, Clarke invited Barbero to have drinks and spend the night with her in a high-rise building where she was staying in corporate housing, despite knowing that Barbero was married. He of course declined;

(b)     Clarke made a pass at him in the car, putting a napkin in his lap and stroking his upper thigh with her hand, then smiling when he flinched and jerked away from her; and

(c)     Clarke repeatedly invited Barbero to have drinks with her, which he continued to decline.

55.     Clarke also repeatedly engaged in conduct that undermined or jeopardized business relationships and opportunities, thereby increasing Barbero's workload and stress level.

56.     Clarke also lorded her protected status over Barbero and made him aware of it; it was not only was management saying she had special/protected status, she said it too.

57.     After Barbero reported Clarke's inappropriate sexual advances toward him to senior management, management said that they would not discuss her with him and instructed him not to make any further complaints.

58.     Barbero continued to inform Wilson of Clarke's inappropriate and unacceptable behavior in order to fully explain why Barbero could not realistically continue to work with Clarke. Wilson deflected and told Barbero that they were not allowed to talk about Clarke;

59.     Barbero felt helpless because both his direct management and the Legal Division were instructed him not to discuss Clarke and he had no one to complain to about her.

60.     Although Zurich was aware that Clarke had repeatedly engaged in inappropriate behavior at work and at work-related functions, was not a strong performer, and made up untrue stories about her coworkers and others, falsely accusing them of criminal acts, the company exposed itself to further liability and its employees to further harassment and defamation by not properly managing Clarke and requiring her to cease acting inappropriately with coworkers and customers, particularly those like Barbero who suffered from health issues as a result of disabilities.

61.     Wilson became very angry with Barbero for attempting to discuss Clarke with him. He refused to finish the conversation and retaliated against Barbero by verbally attacking, disparaging, and belittling Barbero, in his usual loud and profane manner.

62.     Barbero's stress level escalated dramatically, and he became quite concerned about the extreme increased risks to his health caused by increased stress levels.

63.     By September 6, 2014, Barbero felt helpless and had no one he could complain to who would take Clarke's actions seriously and take swift action to protect him from further harassment.

64.     Without any available remedies within Zurich, Barbero simply could not take the stress and the inherent risks to his health and life any longer by staying in its employ.

65.     Barbero informed senior management that he truly believed that he had no choice but to resign in order to protect his health and life unless immediate steps were taken to improve the untenable situation.

66.     In response, Zurich still failed and refused to separate him from Clarke and continued to require Barbero to work directly with her.

67.     Between September 8 and 19, 2014, Barbero talked to different members of senior management and Hedrick to see if they would take appropriate action to protect him and his health by accommodating his disability and protect him from sexual harassment and abusive and retaliatory behavior so he could stay with Zurich, but they failed to do so.

68.     No one from the corporate office even contacted Barbero until September 15, 2014, when he spoke with Hedrick.  Hedrick promised to make calls that day or the next to try and "fix this."  Based on Hedrick's comments, Barbero expected to hear back from her within two days with an update

69.     On September 18, 2014, nearly three weeks after Barbero's inquiry about protection from his coworker's inappropriate, harassing, and stress-inducing behavior, Barbero was informed by Hedrick that no decisions had been made and another attorney would now be involved in the matter.  Barbero was extremely distraught that nothing had been done to address his situation.  He was still required to report to Wilson and work with Clarke

70.     That evening, because of the increased stress and continued conflict in his workplace, and unsafe work environment, Barbero began having chest pains and shortness of breath. He was rushed to the emergency room, where he was diagnosed with a panic attack rather than a heart attack.  At this point, he felt that he had no realistic option but to leave Zurich immediately.

71.     Barbero began making calls advising management that he could no longer remain at Zurich under these conditions, where he was not allowed to make complaints about or discuss with management a coworker who was making sexual, creating a hostile work environment, and making extreme and incredible accusations about others, and where the company refused to separate him from the employee who was creating a hostile work environment unsafe for his health or investigate his allegations about her and others.

72.     Accordingly, on September 19, 2014, foregoing a position which he loved for one with lesser benefits, total compensation, and flexibility, Barbero resigned his employment with Zurich to protect his health and life, and later joined another company.

<u>**COUNT I**</u>
**(ADA, 42 U.S.C. § 12101 *et seq.* against Zurich —**
**Failure to Accommodate, Retaliation, and Hostile Work Environment)**

73.     Barbero realleges and incorporates by reference the paragraphs above.

74.     The ADA prohibits employers from: failing to provide a reasonable accommodation; creating a hostile work environment due to an employee's disability; and retaliating against an employee for engaging in the protected activity of requesting an accommodation or for opposing any unlawful employment practice.

75.     Zurich is an employer within the meaning of 42 U.S.C. §12111(5), in that it employed in excess of fifteen (15) employees in each of twenty (20) or more calendar weeks in the current or preceding calendar year.

Failure to Accommodate

76.     Barbero is a qualified individual with a disability and was able to perform the essential functions of his position with a reasonable accommodation within the meaning of 42 U.S.C. §12111(8) and (9), as he had been successfully performing the job duties in that position for nearly two years.  Alternatively, Barbero has been "regarded as" such within the meaning of 42 U.S.C. § 12102(2)(C) and/or has a "record of a disability" within the meaning of 42 U.S.C.  § 12102(2)(B).

77.     Barbero's MWS is a progressive, debilitating and extremely painful disease.

78.     Barbero's MWS is a chronic and permanent condition that substantially limits one or more major life activities, including, but not limited to: his gastro-intestinal system and ability to manage and deal with extreme stress. He must take strong medications and carefully monitor his stress level and symptoms to avoid risking another potentially fatal internal injury.

79.     Barbero repeatedly and consistently requested reasonable changes to his work conditions, including the opportunity to rest rather than attend the sales seminar in November 2013 due to severe illness, and repeated requests to not be forced to work with coworkers (Holder and Clarke) who were known to consistently behave in an inappropriate, unlawful, and unacceptable manner as an accommodation to his disability, but Zurich denied his requests and failed to engage in the interactive process.

80.     The purpose of these requests was to reduce Barbero's stress to prevent another serious internal injury.

81.     Providing Barbero with a reasonable accommodation would not have posed an undue hardship on Zurich within the meaning of 42 U.S.C. §12111(10).

82.     Zurich failed to accommodate Barbero's requests for a reasonable accommodation and failed to engage in the interactive process.

Hostile Work Environment

83.     Zurich was aware that Wilson created an unwelcome, unprovoked, abusive and hostile work environment based on Barbero's disability that was sufficiently severe or pervasive to alter his conditions of employment in the following ways, including, but not limited to:

a.      Denying Barbero's request for a reasonable accommodation to lie down and rest in his hotel room after violently vomiting all day during the November 2013 sales seminar;

b.      Yelling and cursing at Barbero for being ill during the November 2013 sales seminar;

c.      Delaying Barbero from receiving urgent and life-saving medical treatment;

d.      Pressuring Barbero to return to work early after Barbero complained to Wilson about Holder's harassment;

e.      Threatening to discipline Barbero for requesting the reasonable accommodation of ending Holder's and Clarke's harassment, which was causing Barbero severe stress that could exacerbate the complications from his MWS; and,

f.      in other ways to be proven at trial.

83.     Zurich was aware that Holder created an unwelcome, unprovoked, abusive and hostile work environment based on Barbero's disability that was sufficiently severe or pervasive to alter his conditions of employment in the following ways, including, but not limited to:

a.      Pressuring Barbero to return to work early while Barbero was trying to recover after being hospitalized out of town for eight (8) days and undergoing surgery;

b.  Accusing Barbero of exaggerating or making up his health problems;

c.  Verbally abusing Barbero;

Making a highly inappropriate comment about Barbero's wife, saying that she was prettier than he remembered and that he wouldn't "f***" her or anything while Barbero was recovering; and,

d.  In other ways to be proven at trial.

84.  Zurich was aware that Clarke created an unwelcome, unprovoked, sexually abusive and hostile work environment that exacerbated Barbero's disability and was sufficiently severe or pervasive to alter his conditions of employment in the following ways, including, but not limited to:

a.  Repeatedly inviting him to have drinks and spend the night with her despite knowing that Barbero was married;

b.  Stroking his upper thigh while he was driving and smiling after he flinched and jerked away;

c.  Repeatedly engaging in conduct that undermined or jeopardized business relationships and opportunities, thereby increasing Barbero's workload and stress level; and,

d.  In other ways to be proven at trial.

85.  Barbero complained multiple times throughout his employment with Zurich about their discriminatory and hostile treatment of Barbero because of his disability.

86.  Zurich failed to address Holder's and Wilson's harassment of Barbero based on his disability as well as Clarke's exacerbation of his disability even after he complained to Zurich multiple times.  Wilson, Holder, and Clarke behaved in other inappropriate and unacceptable manners which significantly and unreasonably interfered with Barbero's performance of his work duties, causing constant stress, which adversely affected Barbero's health.

17

87.     Barbero subjectively perceived that the harassment wrought upon him, the inaction by Wilson and other members of company management, and the verbal disparagement by Wilson and other members of management as severe and pervasive because these behaviors were aggressive, insulting, embarrassing, demeaning, humiliating, and deliberate, and because they continued for so long that Barbero felt helpless to reverse the effects and alter the hostile work environment that Zurich created.

88.     Zurich failed to take prompt and adequate action to stop the abuse and harassment, and provide a safe working environment even after obtaining actual knowledge from Barbero's complaints on multiple occasions.

89.     Zurich further failed to take adequate action, even after Barbero's complaints, which together clearly alleged that Holder, Wilson, and Clarke had created a hostile work environment for Barbero. Zurich ignored selective facts and allegations which, instead of leading to appropriate action to correct their behavior, ultimately led to Barbero's resignation in order to protect his health.

90.     As a result, Barbero was subjected to a hostile work environment because of his disability, in violation of the ADA.

Retaliation

90.     Barbero engaged in protected activity under the ADA when he asked Wilson if he could lie down during the November 2013 seminar, and when he complained to senior management about the danger the harassing behavior by Holder, Wilson and Clark posed to his health.

91.     Barbero was forced to resign his employment because of the inaction of management after he complained repeatedly to them about their failure to accommodate his

disability, and opposed the unlawful employment practices to which he was subjected, in violation of the ADA.

92.     A causal connection exists between the protected activity and the adverse actions taken against the Barbero in the loss of his job.

93.     As a result, Barbero has been subjected to retaliation for participating in protected activity under the ADA for reporting Clarke's, Holder's, and Wilson's discriminatory behavior and Zurich's creation and perpetuation of a hostile work environment.

94.     Upon information and belief, Zurich, through its managers and supervisors, retaliated against Barbero by threatening him with disciplinary action if he did not continue to work with coworkers who made him extremely uncomfortable with their inappropriate and unacceptable behavior, which exacerbated his stress level and physical ailments and accelerated the progression and extent of his disability.

95.     As a result, Zurich's conduct caused severe emotional distress to Barbero, including a panic attack that placed him in the emergency room, psychological changes, including depression, anxiety and anxiety attacks, sleeplessness, increased blood pressure, mental anguish, constant pain, and exacerbation of his MWS flare-ups, resulting in the need for increased and more extensive use of sick time.

96.     Zurich's conduct, as described above, was outrageous and aggravated, and included actual malice, oppression, insult, rudeness, indignity, and a reckless and wanton disregard of Barbero's rights and interests under the ADA.  As a result, Barbero is entitled to an award of punitive damages.

97.     Zurich's conduct, as described above, was without justification or excuse, was reprehensible, lasted throughout Barbero's employment under the supervision of Wilson, and

occurred despite Barbero's continued efforts to stop the intimidation, discrimination, belittling, harassment, and retaliation.

98.     Barbero is now and will continue to be unlawfully deprived of wages, seniority, and other monetary and non-monetary benefits because of his disability.

99.     As a proximate and foreseeable result of Zurich's conduct, Barbero has suffered severe emotional distress including a panic attack that placed him in the emergency room, psychological changes, including depression, anxiety and anxiety attacks, sleeplessness, increased blood pressure, mental anguish, constant pain, and exacerbation of his MWS flare-ups, resulting in the need for increased and more extensive use of sick time.

100.    Zurich's actions were done maliciously, willfully or wantonly or in a manner that demonstrates a reckless disregard for Barbero's rights.  As a result of Zurich's conduct, Barbero is entitled to have and recover damages from Zurich, in an amount to be proven at trial in excess of twenty-five thousand dollars ($25,000), including consequential, compensatory, and punitive damages, reinstatement, injunctive relief to deter similar misconduct in the future, back pay, front pay, pre- and post-judgment interest, reasonable attorneys' fees, and the costs of this action.

## <u>COUNT II</u>
### (Title VII – Gender, Sexual Harassment, Hostile Work Environment and Retaliation against Zurich)

101.    Barbero realleges and incorporates by reference the paragraphs above.

102.    Defendant Zurich, through its agents and supervisors, has engaged in unlawful discrimination against Barbero on the basis of his sex in violation of Title VII.

103.    Barbero was forced to resign his employment because of the inaction of management after he complained repeatedly to them about gender discrimination, sexual

harassment, hostile work environment, and retaliation for his opposition to the unlawful employment practices to which he was subjected, in violation of Title VII.

104.    Zurich employs well over 15 employees.

Gender Discrimination:

105.    Barbero was discriminated against because of his sex, which is male.

106.    Barbero suffered an adverse employment action when he was forced to work with Clarke, a female employee who was known to Zurich for her previous sexual harassment of other male employees.

107.    In being forced to work with Clarke, Barbero was told that management would "have [his] back" because he was essentially taking one for the team since Zurich needed to continue to employ Clarke rather than risk a lawsuit from her.

108.    As a result, Barbero has been subjected to discrimination on the basis of his sex in violation of Title VII.

Hostile Work Environment:

109.    Clarke's inappropriate and unacceptable conduct was at all times unwelcome and unprovoked by Barbero, who complained multiple times throughout his employment with Zurich, as did, upon information and belief, other coworkers before him.

110.    Upon information and belief, Clarke's inappropriate and unacceptable conduct was directed exclusively at male employees and Barbero was the target of her behaviors because he is male.

111.    Clarke's conduct was sufficiently severe and pervasive to alter Barbero's conditions of employment and to create an abusive work environment.  Clarke's conduct was pervasive in that she frequently made overt sexual advances toward Barbero and others, and

behaved in other inappropriate and unacceptable manners which significantly and unreasonably interfered with Barbero's performance of his work duties, causing constant stress, which adversely affected Barbero's health.

112. Barbero also subjectively perceived that the sexual harassment wrought upon him by Clarke, the inaction by Wilson and other members of company management, and the verbal disparagement by Wilson and other members of management as severe and pervasive because these behaviors were aggressive, insulting, embarrassing, demeaning, humiliating, and deliberate, and because they continued for so long that Barbero felt helpless to reverse the effects and alter the hostile work environment that Zurich created.

113. Zurich failed to take prompt and adequate action to stop the abuse and harassment, even after obtaining actual knowledge from Barbero's complaints on multiple occasions. Additionally, upon information and belief, Zurich had constructive knowledge based on (a) the pervasiveness of Clarke's abusive treatment of men, and (b) prior and contemporaneous complaints that were made by other male employees of Zurich.

114. Zurich further failed to take adequate action, which clearly alleged that Clarke had created a hostile work environment for men, including Barbero. Zurich ignored selective facts and allegations which, instead of leading to appropriate action to correct Clarke's behavior long before Barbero's forced interactions with her, ultimately led to Barbero's resignation in order to protect his health.

115. As a result, Barbero was subjected to a hostile work environment because of his sex, in violation of Title VII.

Retaliation:

116.    Barbero engaged in protected activity under Title VII of the Civil Rights Act when he reported to Zurich the harassing behavior by Clarke based on his gender.

117.    After Barbero reported Clarke's harassing behavior to Zurich, Wilson and other members of management took no corrective action whatsoever to adjust Clarke's behavior towards males or coach her to change her actions towards her coworkers.

118.    Upon information and belief, Zurich, through its managers and supervisors, retaliated against Barbero by threatening him with disciplinary action if he did not continue to work with coworkers who made him extremely uncomfortable with their inappropriate and unacceptable behavior, which exacerbated his stress level and physical ailments and accelerated the progression and extent of his disability.

119.    As a result of Barbero's report of this inappropriate and unacceptable behavior and management's inaction to correct Clarke's behavior, Barbero was forced to resign his employment.

120.    A causal connection exists between the protected activity and the adverse actions taken against Barbero in the loss of his job.

121.    As a result, Barbero has been subjected to retaliation for participating in protected activity under Title VII for reporting Clarke's discriminatory behavior and the creation and perpetuation of a hostile work environment.

122.    As a proximate and foreseeable result of Zurich's conduct, Barbero has suffered severe emotional distress including a panic attack that placed him in the emergency room, psychological changes, including depression, anxiety and anxiety attacks, sleeplessness,

increased blood pressure, mental anguish, constant pain, and exacerbation of his MWS flare-ups, resulting in the need for increased and more extensive use of sick time.

123.    Zurich's actions were done maliciously, willfully or wantonly or in a manner that demonstrates a reckless disregard for Barbero's rights.  As a result of Zurich's conduct, Barbero is entitled to have and recover damages from Zurich, in an amount to be proven at trial in excess of twenty-five thousand dollars ($25,000), including consequential, compensatory, and punitive damages, reinstatement, injunctive relief to deter similar misconduct in the future, back pay, front pay, pre- and post-judgment interest, reasonable attorneys' fees, and the costs of this action.

## COUNT III
### (Battery against Zurich)

124.    Barbero realleges and incorporates by reference the paragraphs above.

125.    Without just cause or provocation, Clarke touched Barbero in an unlawful and unwelcome sexual manner, causing him injuries and damages.

126.    Clarke acted as an employee and agent of Zurich, and Zurich is liable to Barbero for Clarke's intentional tort under the doctrine of *respondeat superior*.

127.    Clarke committed battery on Barbero during the course of her employment for Zurich.

128.    Zurich had knowledge of, authorized, and/or ratified the intentional acts of Clarke by failing, upon information and belief, to adequately investigate prior instances of unlawful sexual harassment and/or touching by Clarke against other male employees, failing to correct her unlawful and unwelcome conduct, and because Zurich's managing employees specifically told Barbero to deal with Clarke's unlawful sexual conduct and battery so it could avoid a multimillion dollar lawsuit from her.

129.    As a proximate and foreseeable result of Zurich's conduct, Barbero has suffered severe emotional distress including a panic attack that placed him in the emergency room, psychological changes, including depression, anxiety and anxiety attacks, sleeplessness, increased blood pressure, mental anguish, constant pain, and exacerbation of his MWS flare-ups, resulting in the need for increased and more extensive use of sick time.

130.    Zurich's actions were done maliciously, willfully or wantonly or in a manner that demonstrates a reckless disregard for Barbero's rights.  As a result of Zurich's conduct, Barbero is entitled to recover his back wages, nominal, compensatory and punitive damages, attorneys' fees and costs, in an amount to be established at trial, but in excess of twenty five thousand dollars ($25,000), together with interest thereon at the prevailing rate.

## COUNT IV
### (Negligent Infliction of Emotional Distress against Wilson and Hedrick)

131.    Barbero realleges and incorporates by reference the paragraphs above.

132.    Wilson owed Barbero a duty of care given his managerial role within Zurich and his role as Barbero's manager.

133.    Wilson breached his duty of care to Barbero by:

a.    Denying Barbero's request for a reasonable accommodation to lie down and rest in his hotel room after violently vomiting all day during the November 2013 sales seminar;

b.    Yelling and cursing at Barbero for being ill during the November 2013 sales seminar;

c.    Delaying Barbero from receiving urgent and life-saving medical treatment;

d.    Allowing Wilson's wife to enter Barbero's hospital room, inappropriately reviewing his medical chart, and challenging the severity of his disability;

e.    Pressuring Barbero to return to work early after Barbero complained to Wilson about Holder's harassment;

f.      Threatening to discipline Barbero for requesting the reasonable accommodation of ending Holder's and Clarke's harassment, which was causing Barbero severe stress that could exacerbate the complications from his MWS; and,

g.      In other ways to be proven at trial.

134.    Hedrick owed Barbero a duty of care given her role as Zurich's general counsel and the fact she held herself out to Barbero as his protector based on Hedrick's promises to Barbero that she would protect him from Clarke.

135.    Hedrick breached her duty of care to Barbero by dismissing his complaints about Clarke, instructing him not to talk about Clarke with anyone, and telling him that he needed to help them out by working with Clarke and that Zurich management "would have [his] back."

136.    Wilson and Hedrick failed to exercise due care in performance of their legal duty owed to Barbero given his concerns and repeated conversations with them regarding his need to control his stress levels to prevent a health crisis.

137.    Wilson's and Hedrick's actions as described above constitute negligence in that it was reasonably foreseeable that ignoring Barbero's complaints of harassment and retaliation would cause Barbero severe emotional distress, and the conduct did in fact cause Barbero to suffer such severe emotional distress with life-threatening physical consequences.

138.    As a proximate and foreseeable result of Wilson's and Hedrick' conduct, Barbero has suffered severe emotional distress including a panic attack that placed him in the emergency room, psychological changes, including depression, anxiety and anxiety attacks, sleeplessness, increased blood pressure, mental anguish, constant pain, and exacerbation of his MWS flare-ups, resulting in the need for increased and more extensive use of sick time.

139.    Wilson's and Hedrick's actions were done maliciously, willfully or wantonly or in a manner that demonstrates a reckless disregard for Barbero's rights. As a result of Wilson's and Hedrick's conduct, Barbero is entitled to recover damages in an amount to be proven at trial in excess of twenty-five thousand dollars ($25,000), including direct, consequential, general, compensatory, special, and punitive damages, back pay, front pay, prejudgment interest, and the costs of this action.

## COUNT V
### (Negligent Retention and Supervision of Clarke against Zurich for the Underlying Tort of Battery)

140.    Barbero realleges and incorporates by reference the paragraphs above.

141.    Clarke committed battery against Barbero by putting a napkin in his lap and stroking his upper thigh with her hand. Barbero reported the unwelcome sexual harassment and battery to upper management, but was still forced to work with Clarke so Zurich could avoid a lawsuit from her.

142.    Zurich had knowledge of, authorized, and/or ratified the intentional acts of Clarke, upon information and belief, failed to investigate prior instances of unlawful sexual harassment and/or touching by Clarke against other male employees, failed to correct her unlawful and unwelcome conduct, and Zurich's managing employees specifically told Barbero to deal with Clarke's unlawful sexual conduct and battery so it could avoid a multimillion dollar lawsuit from her.

143.    Zurich had a duty to protect Barbero from Clarke, who had a known pattern and practice of such behavior as other male employees complained to management about her unlawful behavior.

144.   Zurich, through its employees and agents, breached its duty to Barbero by negligently retaining and supervising Clarke and exposing Barbero and others to Clarke's tortious conduct as described above.

145.   Zurich's conduct, through its employees and agents, as described above, was without justification or excuse, was reprehensible, and occurred despite Barbero's continued efforts to stop the harassment, discrimination, and retaliation after Barbero notified Zurich of Clarke's discriminatory and retaliatory treatment of Barbero because of his gender and because of his rebuff of her unwanted sexual advances.

146.   As a proximate and foreseeable result of Zurich's conduct, Barbero has suffered severe emotional distress including a panic attack that placed him in the emergency room, psychological changes, including depression, anxiety and anxiety attacks, sleeplessness, increased blood pressure, mental anguish, constant pain, and exacerbation of his MWS flare-ups, resulting in the need for increased and more extensive use of sick time.

147.   Zurich's actions were done maliciously, willfully or wantonly or in a manner that demonstrates a reckless disregard for Barbero's rights.  As a result of Zurich's conduct, Barbero is entitled to recover damages in an amount to be proven at trial in excess of twenty-five thousand dollars ($25,000), including direct, consequential, general, compensatory, special, and punitive damages, back pay, front pay, prejudgment interest, and the costs of this action.

## COUNT VI
### (Negligent Supervision of Wilson against Zurich for the Underlying Tort of Negligent Infliction of Emotional Distress)

148.   Barbero realleges and incorporates by reference the paragraphs above.

149.   Zurich had a duty to properly supervise its employees, including Wilson.

150.     Zurich had a duty to supervise Wilson to prevent him from negligently inflicting severe emotional distress, which in turn would cause Barbero's MWS to flare up.

151.     Zurich, through its employees and agents, participated in and perpetuated Wilson's negligence, harassment, discrimination, and retaliatory behavior in response to Barbero's complaints of gender discrimination and inaction on his request for accommodation in keeping with the ADA.

152.     Zurich, through its employees and agents, breached its duty to Barbero by negligently supervising Wilson and exposing Barbero to his negligence, harassment, discrimination, and retaliation, as described above.

153.     Zurich was negligent in supervising Wilson by failing to use the ordinary care of a reasonable and prudent person to: properly and adequately oversee, monitor, direct, and counsel Wilson regarding his treatment of Barbero, consider Wilson's personal motivations in retaliating against Barbero by requiring Barbero to work with Clarke, thereby forcing his resignation, and protect Barbero from injury.

154.     Zurich's conduct, through its employees and agents, as described above, was without justification or excuse, was reprehensible, and occurred despite Barbero's continued efforts to stop the harassment, discrimination, and retaliation and after Barbero notified Zurich of Holder and Wilson's discriminatory and retaliatory treatment of Barbero because of his gender and disability.

155.     Zurich's negligent retention of Wilson was a direct and proximate cause of Barbero's injuries and damages.

156.     As a proximate and foreseeable result of Zurich's conduct, Barbero has suffered severe emotional distress including a panic attack that placed him in the emergency room,

psychological changes, including depression, anxiety and anxiety attacks, sleeplessness, increased blood pressure, mental anguish, constant pain, and exacerbation of his MWS flare-ups, resulting in the need for increased and more extensive use of sick time.

157.    Zurich's actions were done maliciously, willfully or wantonly or in a manner that demonstrates a reckless disregard for Barbero's rights.  As a result of Zurich's conduct, Barbero is entitled to recover damages in an amount to be proven at trial in excess of twenty-five thousand dollars ($25,000), including direct, consequential, general, compensatory, special, and punitive damages, back pay, front pay, prejudgment interest, and the costs of this action.

## PRAYER FOR RELIEF

WHEREFORE, Barbero respectfully prays the Court as follows:

1.    Pursuant to Count I (ADA against Zurich), that Barbero have and recover judgment against Defendant Zurich for damages in an amount in excess of twenty five thousand dollars ($25,000.00) to be proven at trial, including compensatory damages, consequential damages, and punitive damages, injunctive relief to deter similar misconduct in the future, back pay, front pay, pre- and post-judgment interest, reasonable attorneys' fees, and the costs of this action.

2.    Pursuant to Count II (Title VII against Zurich), that Barbero have and recover judgment against Defendant Zurich for damages in an amount in excess of twenty five thousand dollars ($25,000.00) to be proven at trial, including compensatory damages, consequential damages, and punitive damages, injunctive relief to deter similar misconduct in the future, back pay, front pay, pre- and post-judgment interest, reasonable attorneys' fees, and the costs of this action.

3.     Pursuant to Count III, (Battery against Zurich), that Barbero have and recover judgment against Defendant Zurich including nominal, compensatory and punitive damages, attorneys' fees and costs, in an amount to be established at trial, but in excess of twenty five thousand dollars ($25,000), together with interest thereon at the prevailing rate.

4.     Pursuant to Count IV, (Negligent Infliction of Emotional Distress against Wilson and Hedrick), that Barbero have and recover judgment against Defendants Wilson and Hedrick for damages in an amount to be proven at trial in excess of twenty-five thousand dollars ($25,000), including direct, consequential, general, compensatory, special, and punitive damages, back pay, front pay, prejudgment interest, and the costs of this action.

5.     Pursuant to Count V (Negligent Retention and Supervision of Employee Clarke against Zurich for the Underlying Tort of Battery), that Barbero have and recover judgment against Defendant Zurich for damages in an amount to be proven at trial in excess of twenty five thousand dollars ($25,000.00), including reinstatement, direct, consequential, general, compensatory, special, and punitive damages, back pay, front pay, prejudgment interest, and the costs of this action.

6.     Pursuant to Count VI (Negligent Supervision of Employee Wilson against Zurich for the Underlying Tort of Negligent Infliction of Emotional Distress), that Barbero have and recover judgment against Defendant Zurich for damages in an amount to be proven at trial in excess of twenty-five thousand dollars ($25,000), including direct, consequential, general, compensatory, special, and punitive damages, back pay, front pay, prejudgment interest, and the costs of this action.

7.     That Barbero have and recover all costs incurred in this action, including attorneys' fees;

8.      That Defendants be held jointly and severally liable.

9.      That this action be tried by jury.

10.     That the Court may grant such other and further relief as it deems just and proper.

Respectfully submitted, this the 8th day of December, 2016.


                              MALONEY LAW & ASSOCIATES, PLLC


                              /s/ Margaret B. Maloney
                              Margaret Behringer Maloney, N.C. Bar No. 13253
                              1824 East Seventh Street
                              Charlotte, NC 28204
                              mmaloney@maloneylegal.com
                              Telephone:  704-632-1622
                              Facsimile:  704-632-1623
                              *Attorney for Plaintiff*

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that I electronically filed the foregoing **VERIFIED AMENDED COMPLAINT** with the Clerk of Court using the CM/ECF system which will send electronic notification to counsel for Defendant as follows:

> Keith Weddington
> Parker Poe Adams & Bernstein, LLP
> 401 South Tryon Street, Ste. 3000
> Charlotte, NC  28202-1935
> keithweddington@parkerpoe.com
> Telephone: 704-335-9035
> Facsimile: 704-335-9697

This the 8th day of December, 2016.


MALONEY LAW & ASSOCIATES, PLLC

/s/ Margaret Behringer Maloney
Margaret Behringer Maloney, N.C. Bar No. 13253
1824 East Seventh Street
Charlotte, NC  28204
mmaloney@maloneylegal.com
Telephone: (704) 632-1622
Facsimile: (704) 632-1623
*Attorney for Plaintiff*

STATE OF NORTH CAROLINA

COUNTY OF MECKLENBURG

JOHN BARBERO,

Plaintiff,

v.

ZURICH AMERICAN INSURANCE
COMPANY, JANET HEDRICK, and DUSTY
WILSON

Defendants.

IN THE GENERAL COURT OF JUSTICE
SUPERIOR COURT DIVISION
16-CVS-19993

**VERIFICATION**

STATE OF NORTH CAROLINA    )
                           )
COUNTY OF MECKLENBURG      )

BEFORE ME, the undersigned authorized authority, in and for said State and County,

personally appeared John Barbero, who is known to me, and who, being by me first duly sworn,

deposes and says as follows: that the factual averments contained in the foregoing Verified

Amended Complaint are true and correct to the best of his knowledge, information and belief.

_____
John Barbero

SWORN TO and subscribed before
me this 8th day of December, 2016

Melissa B Hall
NOTARY PUBLIC for the State of North Carolina

My commission expires: May 6, 2019

[SEAL]